USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/1/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- X
                                 :
THERESA WAIGUCHU,                  :
                                 :
                    Plaintiff,     :            1:25-cv-7443-GHW
                                 :
              -v-                   :            MEMORANDUM
                                 :        OPINION & ORDER
MORGAN STANLEY & CO. LLC,      :
                                 :
                   Defendant.   :
                                 :
--------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Theresa Waiguchu worked for Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Firm"). As one of only two Black women on her team, Ms. Waiguchu alleges that she was treated differently than her white, male colleagues. Her first supervisor—a man—assigned more complex work to men who were junior to Ms. Waiguchu and spoke to her in a condescending and hostile tone. Twice he shouted at her about her work performance during meetings with her colleagues. Her second supervisor—a woman—also subjected Ms. Waiguchu to what she describes as "microagressions," and did not provide Ms. Waiguchu the same opportunities that she provided to other employees.

As a result, Ms. Waiguchu commenced this action. In it, she asserts claims of discrimination and retaliation on the basis of her gender, race, and disability under federal, state, and city law. Morgan Stanley has moved to compel arbitration of her claims because the conduct of its employees alleged in the complaint is not conduct constituting "sexual harassment" under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA"). While Ms. Waiguchu has alleged that she was treated less well than others on the basis of her gender, her allegations of disparate treatment in the workplace do not constitute the kind of "sexual

harassment" conduct that Congress excluded from arbitration under the EFAA.  Therefore, Morgan

Stanley's motion to compel is GRANTED.

## II.    BACKGROUND

### A.  Parties

Morgan Stanley is a multinational financial institution that offers an array of financial

services.  Dkt. No. 1 (the "Complaint" or "Compl.") ¶ 10.  Morgan Stanley is organized as a limited

liability company and is headquartered in New York City.  Dkt. No. 9; Compl. ¶ 10.  Ms. Waiguchu

resides in the State of New York.  Compl. ¶ 8.  Ms. Waiguchu is a Black woman.  *Id.* ¶ 52.

### B.  Ms. Waiguchu's Allegations[1]

#### 1.  Ms. Waiguchu's Position at the Firm

Ms. Waiguchu joined Morgan Stanley on May 22, 2022.  *Id.* ¶¶ 6, 12.  She served as a Vice

President of Securities-Based Lending Solutions in the Pipeline Management Team within the Firm's

U.S Banks division.  *Id.* ¶ 2.  In her role, she was "responsible for handling numerous escalations of

transactions."  *Id.*

#### 2.  Alleged Discrimination by First Supervisor

Ms. Waiguchu was first supervised by Jens Krause.  *Id.* ¶ 18.  Mr. Krause prepared Ms.

Waiguchu's first performance review.  *Id.*  In it, he recognized Ms. Waiguchu's "strong work ethic

and professionalism" and praised her diligence.  *Id.*  Despite this positive early feedback, Mr. Krause

---

[1] The Court accepts all facts alleged in the complaint as true and draws all reasonable inferences in Ms. Waiguchu's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).  Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive.  *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

noted that Ms. Waiguchu was "'defensive and judgmental' in her communications with colleagues" and advised her to "'consider the other party's intentions' when responding to workplace interactions." *Id.* ¶ 19. Ms. Waiguchu alleges that this "emphasis on 'intent' over impact would become a recurring theme in Mr. Krause's treatment of both Ms. Waiguchu and the only other Black woman on her team, Rebecca Jones . . . ." *Id.* ¶ 20.

In February 2023, Ms. Waiguchu requested a "long-term roadmap" to help her "better understand her responsibilities . . . particularly in comparison to those of the Assistant Vice Presidents." *Id.* ¶ 21. Mr. Krause explained that "there were no concrete metrics or criteria to evaluate the VP role" and that VPs "would handle more 'complex and substantive' assignments than AVPs." *Id.* ¶ 22. Ms. Waiguchu alleges that this lack of distinction between the VP and AVP role "would later be used to rationalize the disparate treatment towards Ms. Waiguchu and Ms. Jones." *Id.* ¶ 21.

"Despite the purported complexity of VP assignments, Ms. Waiguchu observed that the more substantive and high-impact assignments were routinely delegated to associates, AVPs, and analysts, bypassing both herself and Ms. Jones." *Id.* ¶ 23. In an attempt to "prove her value," Ms. Waiguchu volunteered for challenging projects and responsibilities. *Id.* Yet, "[r]ather than being recognized, her ideas were frequently co-opted and reassigned to lower-ranking colleagues[,] her contributions were overlooked, and she was repeatedly told that she had failed to meet the undefined expectations of her role." *Id.*

Ms. Waiguchu alleges that Mr. Krause "routinely demonstrated overt favoritism toward employees with children, while penalizing [her] based on her parental status." *Id.* ¶ 24. The Complaint states that once, when she was late to arrive at work because of a migraine and bad traffic, "Mr. Krause berated [her] during [a] meeting, repeatedly shouting at her to 'listen' and lectured her on the importance of punctuality in a condescending and hostile tone." *Id.* ¶¶ 26–27.

When Ms. Waiguchu noted the disparate treatment between her and others who occasionally arrived late or left early for family obligations "without similar scrutiny," Mr. Krause dismissed her observations, "claiming that their situations were 'different' because they had children." *Id.* ¶ 27. Ms. Waiguchu believed that Mr. Krause frequently "prioritized employees with children over . . . Ms. Waiguchu . . . ." *Id.* ¶ 28. Mr. Krause then made "belittling comments," suggesting that "[Ms. Waiguchu] was not smart enough to understand catching an earlier train." *Id.* ¶ 29. Ms. Waiguchu alleges that "[t]his was just one of several times Mr. Krause spoke to [her] in a degrading and condescending way." *Id.*

"During a call regarding data hygiene issues, Mr. Krause continued his pattern of belittling and condescending behavior, particularly toward the black women on his team." *Id.* ¶ 31. Ms. Waiguchu had made a data entry error as a result of what she describes as vague instructions from Mr. Krause. *Id.* ¶ 32. Rather than "offer meaningful clarification," Mr. Krause "insisted that Ms. Waiguchu should have 'intuitively understood' his expectations" and made further remarks "that deflected blame and subtly cast doubt on [Ms. Waiguchu's] competence." *Id.* Mr. Krause added that the answers to his questions were "crystal clear . . . but it doesn't seem like it is to you or [Ms. Jones]." *Id.* ¶ 34. Ms. Waiguchu alleges that "[t]his remark not only singled out both black women but also reinforced a pattern of condescension and exclusion." *Id.*

In a March 2023 meeting, "Mr. Krause berated Ms. Waiguchu and Ms. Jones regarding their edits to an internal document." *Id.* ¶ 35. He stated, "[f]orgive me, but I find it funny that English is my second language, and I have to teach English-speaking employees how to write in English." *Id.* He instructed Ms. Waiguchu and Ms. Jones to look up words in the dictionary and asked, "[n]ow that we know the definitions and meaning of these words, do you think they belong in these sentences?" *Id.* According to Ms. Waiguchu, this "demeaning approach stood in stark contrast to how white and male colleagues were treated when receiving feedback for similar work product." *Id.*

Ms. Waiguchu and Ms. Jones reported Mr. Krause's conduct to Alex Stetter, a Managing Director at the Firm. *Id.* ¶ 36. "[T]heir concerns were summarily dismissed." *Id.* Mr. Stetter then "subjected them to an adversarial line of questioning," pressing Ms. Waiguchu and Ms. Jones to explain "whether they had failed to deliver on Mr. Krause's request, or whether Mr. Krause was simply being unreasonable." *Id.*

"Almost immediately" after the report to Mr. Stetter, "Mr. Krause removed Ms. Waiguchu from a large project." *Id.* ¶ 37. While Mr. Krause claimed that the decision was not based on Ms. Waiguchu's performance, Ms. Waiguchu alleges that this was later contradicted in her performance review where "Mr. Krause criticized the quality of the [her work on the] project" and "stated he had been forced to complete it himself because it was not up to his standards." *Id.* The Complaint alleges that this "strongly suggest[s] a retaliatory motive in excluding Ms. Waiguchu from meaningful assignments." *Id.*

During a meeting with Human Resources in April 2023, Ms. Waiguchu "recounted an incident where Mr. Krause shouted at her in front of multiple colleagues, once again targeting her for her supposed 'negative personality trait' of defensiveness." *Id.* ¶ 39. Ms. Waiguchu "explicitly identif[ied] the conduct as a microaggression." *Id.* "Despite having formally reported Mr. Krause's discriminatory and retaliatory conduct, Ms. Waiguchu and Ms. Jones remained under his management and continued to experience ongoing microaggressions and retaliation." *Id.* ¶ 41. Several months later, Ms. Waiguchu learned the results of Human Resources' investigation of her complaints about Mr. Krause: "she was informed that there was 'no evidence,' verbal or written to substantiate the complaints she and Ms. Jones had raised. HR ultimately concluded that Mr. Krause's . . . conduct amounted to nothing more than 'miscommunicated feedback' . . . ." *Id.* ¶ 43.

### 3.  Alleged Discrimination by Second Supervisor

In May 2023, Mr. Krause was reassigned to a new position. *Id.* ¶ 42. He was replaced by

Nina Chotani. *Id.* ¶ 46. Under Ms. Chotani's supervision, Ms. Waiguchu alleges, "Ms. Waiguchu experienced an escalating pattern of targeted monitoring and micromanagement that differed from her white and male colleagues." *Id.*

On August 31, 2023, after Ms. Waiguchu rescheduled a meeting with a new associate due to illness, Ms. Chotani "replied curtly that she did not believe rescheduling was appropriate" and remarked that she "could have assigned [the associate] to someone else." *Id.* ¶ 47. Ms. Waiguchu questioned her tone and underlying message, to which Ms. Chotani replied, "I'm on your side as long as you want me to be." *Id.* Ms. Waiguchu was unsettled by what she describes as the "implication that her supervisor's support was conditional, and could be withdrawn at any moment." *Id.* ¶ 48. The Complaint alleges that "[t]hrough this exchange, Ms. Waiguchu came to recognize that Ms. Chotani's leadership style offered no meaningful improvement over Mr. Krause's, and in many ways, continued the same pattern of retaliatory and hostile behavior." *Id.* ¶ 49.

In a September 2023 follow-up meeting with a member of the Employee Relations Department, Ms. Waiguchu addressed her ongoing concerns about discriminatory treatment. *Id.* ¶ 50. During the meeting, "she emphasized that Morgan Stanley had failed at every turn to protect her from microaggressions and workplace harassment." *Id.* She noted that, under Ms. Chotani, "the harassment had become 'more subtle,' yet remained persistent and was actively escalating." *Id.* ¶ 51. "She explained that both herself and Ms. Jones continued to propose projects that were ultimately reassigned to male AVP colleagues, were excluded from critical meetings, and were denied access to key information needed to fulfill their responsibilities." *Id.* Ms. Waiguchu characterized the behavior as "'workplace sabotage' and drew a direct comparison between the treatment of herself and Ms. Jones, both black women, and their white/non-black male AVP peers, who did not face similar scrutiny or exclusion." *Id.* ¶ 52.

Ms. Waiguchu requested a transfer to another team, but her request was denied, citing the

firm's 18-month minimum service policy. *Id.* ¶ 53. When Ms. Waiguchu raised the denial with Lisa Sweberg of the Firm's Employee Relations Department, Ms. Sweberg "made several dismissive and inappropriate remarks, including: "[y]ou're saying that [Mr. Stetter] now is somehow retaliatory?" and "[d]id you have a role in mind, or did you expect HR to do it for you?" *Id.* ¶ 54. Ms. Waiguchu alleges that this "confirmed a pattern: when she reported mistreatment in good faith, Morgan Stanley's response was not one of support, but of deflection, denial, and further marginalization." *Id.*

In October 2023, Ms. Waiguchu raised concerns with Ms. Chotani regarding the efficiency of their "After Action Reports" process. *Id.* ¶ 55. Ms. Waiguchu "maintained a calm and measured tone" while expressing her concerns to which Ms. Chotani responded, "take a step back" and "be reasonable." *Id.* ¶ 56. Ms. Chotani adopted what Ms. Waiguchu describes as a patronizing tone and asked a rhetorical question that Ms. Waiguchu understands to have been "intended to minimize Ms. Waiguchu's input." *Id.* ¶ 57. Ms. Waiguchu alleges that this "further reflected the ongoing pattern of discriminatory and demeaning treatment." *Id.* ¶ 58.

In a November 2023 call with Ms. Sweberg, Ms. Waiguchu's concern that Mr. Stetter appeared significantly "less friendly" and "less communicative with her compared to her white and male colleagues" was dismissed. *Id.* ¶¶ 59, 62. When Ms. Waiguchu explained that her fear of past allegedly discriminatory experiences made her reluctant to engage with Mr. Stetter, Ms. Sweberg told her that "[c]ommunication goes both ways." *Id.* ¶ 62. Ms. Waiguchu also perceived this remark to delegitimize her concerns. *Id.*

"On November 15, 2023, in a one-on-one meeting, Ms. Chotani confronted Ms. Waiguchu about 'attacking' her in emails. Ms. Waiguchu denied this, explicitly identified the statement as yet another a microaggression from Ms. Chotani, characterizing her as aggressive, a common stereotype applied to black women." *Id.* ¶ 63.

Ms. Waiguchu alleges that "[b]eginning in Spring 2024, Ms. Chotani started to escalate her discriminatory behavior . . . by constantly monitoring and interrogating her regarding her in-office status." *Id.* ¶ 67.  Ms. Chotani "implemented a special 'check-in' requirement solely for Ms. Waiguchu." *Id.* ¶ 68.  "This heightened and baseless scrutiny was not applied to Ms. Waiguchu's male or white colleagues, illustrating a pattern of disparate treatment." *Id.*

During a one-on-one meeting, Ms. Chotani criticized Ms. Waiguchu's Teams status and added a formal policy to the department rulebook as a result. *Id.* ¶ 69.  Ms. Waiguchu alleges that this "indicat[ed] a targeted action." *Id.*  Ms. Waiguchu alleges that on at least three occasions, Ms. Chotani "monitored Ms. Waiguchu's desk occupancy and movements, even asking colleagues about her whereabouts, a level of surveillance not applied to white or male team members." *Id.* ¶ 70.

"Ms. Chotani routinely approved remote work and early departures for white and male employees . . . while denying similar flexibility to Ms. Waiguchu." *Id.* ¶ 71.  In January 2024, after Ms. Waiguchu requested a temporary remote work arrangement to care for her sick father, Ms. Waiguchu alleges that Ms. Chotani subjected her "to a series of invasive and inappropriate personal questions, including:  'Do you live near your parents?' and 'What would you be doing for your father that he would be unable to do for himself?'" *Id.* ¶ 73.  "These inquiries, both irrelevant to the request and deeply personal, were not posed to white or male employees who sought and received similar accommodations." *Id.*  Ms. Chotani continued her line of questioning, asking when Ms. Waiguchu had last worked three consecutive days in office. *Id.* ¶ 74.  Ms. Waiguchu "expressed discomfort with the intrusive nature of the questioning" and Ms. Chotani denied the remote work request. *Id.*  The Complaint adds that the "discriminatory nature of this denial is underscored by the fact that Ms. Chotani had recently approved nearly identical accommodations for white and/or male colleagues." *Id.*

In addition to the Firm's allegedly discriminatory treatment of her, Ms. Waiguchu contends

that Morgan Stanley retaliated against her after she took protected leave under the Family Medical Leave Act. *Id.* ¶¶ 76–80. What's more, she alleges, "Morgan Stanley repeatedly failed to provide reasonable accommodations for Ms. Waiguchu's well-documented disabilities, including chronic migraines . . . ." *Id.* ¶ 81. In particular, she alleges that the Firm improperly denied her request to work remotely three days a week rather than two. *Id.* ¶ 84. She alleges that her declining mental and physical health was the result of the hostile work environment that she experienced at Morgan Stanley. *Id.* ¶¶ 86–87.

### C. The Arbitration Agreement

Before Ms. Waiguchu began her work at Morgan Stanley, she received an offer letter from the Firm. Dkt. No. 22-1 (Stipulations on Defendant's Motion to Dismiss Plaintiff's Sexual Harassment Claims and Compel Arbitration ("Stips.")) ¶ 1. Ms. Waiguchu signed and accepted the offer letter on May 25, 2022. *Id.* ¶ 3. Ms. Waiguchu's offer letter included her "Terms & Conditions of Employment." Dkt. No. 22-1 Exhibit A at ECF 4, 5. That section of the letter included a provision entitled "Arbitration Agreement," which provided the following:

> As part of accepting this offer of employment, you agree to the terms and conditions of the Firm's Arbitration Agreement, which is attached, unless you opt out of the Arbitration Agreement by submitting the New Hire CARE Arbitration Program Opt Out Form within 30 days of your Start Date . . . . The Arbitration Agreement provides, among other things, that you agree to have all Covered Claims (as defined in the Agreement) resolved by final and binding Arbitration on an individual basis (i.e., non−class action, non−collective action and non−representative action).

*Id.* at ECF 7. Ms. Waiguchu did not opt out of the Arbitration Agreement. Stips. ¶ 4.

Section 2 of the attached Arbitration Agreement described the scope of the claims that were subject to arbitration as follows:

> Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and

conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring. Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.

Dkt. No. 22-1 Exhibit B at ECF 9. The Arbitration Agreement specifically excluded other claims from mandatory arbitration. *Id.* at 9, 10. Amongst the category of excluded claims is "any claim that is expressly precluded from arbitration by a federal statute, including without limitation the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021." *Id.*

### D. Procedural History

Ms. Waiguchu commenced this action on September 8, 2025. Dkt. No. 1. Her complaint asserted claims for discrimination under Title VII of the Civil Rights Act of 1964 (Count I), 42 U.S.C. § 1981 (Count III), the New York State Human Rights Law (the "NYSHRL") (Count V), and the New York City Human Rights Law (the "NYCHRL") (Count VII). Ms. Waiguchu also asserted claims for retaliation under each of Title VII (Count II), Section 1981 (Count IV), the NYSHRL (Count VI), and the NYCHRL (Count VIII). Finally, Ms. Waiguchu asserted claims for alleged violations of the Americans with Disabilities Act (Count IX) and the Family Medical Leave Act (Count X).

On November 7, 2025, Morgan Stanley filed a motion to dismiss Ms. Waiguchu's claims of "sexual harassment" and to compel arbitration of her remaining claims. Dkt. No. 21 (notice of motion); Dkt. No. 22 (memorandum of law or "MOL"). Morgan Stanley also filed a stipulation of

facts to which the parties had agreed, which included the fact that Ms. Waiguchu had accepted the arbitration agreement and its terms. *See generally* Stips.

In their motion, Morgan Stanley first moved to dismiss "Plaintiff's sexual harassment claims because the Complaint lacks any plausible factual allegations supporting that any purported harassment was actually based on her gender or sex." MOL at 5. Oddly, in moving to dismiss the claims, Morgan Stanley did not argue that Ms. Waiguchu had inadequately pleaded her claims under any of the applicable statutes. Instead, Morgan Stanley argued that to determine whether the claims themselves should be dismissed, the Court should apply the standard for determining whether the alleged misconduct triggered the EFAA. *Id.* at 5–6.

Morgan Stanley pointed to the Court's holding in *Owens v. PriceWaterHouseCoopers LLC*, 786 F. Supp. 3d 831 (S.D.N.Y. 2025), that not all gender-based discrimination triggered the protection of the EFAA. *Id.* at 6. On that basis, Morgan Stanley went on to argue that Ms. Waiguchu's sexual harassment claims should be dismissed because she had not adequately pleaded "a claim of *sex harassment*—not merely gender discrimination of any kind." *Id.* at 7. Morgan Stanley contended that Ms. Waiguchu's account of microaggressions did not constitute conduct that was sexual harassment. *See generally* MOL. The Firm concluded: "For all these reasons, as set forth above, Plaintiff's purported sex harassment claims should be dismissed." *Id.* at 11. Morgan Stanley then argued that "following the dismissal of her implausibly pled sexual harassment claims, Plaintiff's *remaining* claims must be compelled to arbitration." *Id.* at 14 (emphasis added).

On December 5, 2025, Ms. Waiguchu filed a memorandum of law in opposition to the motion to dismiss and compel arbitration. Dkt. No. 23 ("Opp."). In her opposition, she argued that the "differential treatment" and "gender stereotyping" that she allegedly experienced at Morgan Stanley constituted "sexual harassment," triggering the EFAA. *See, e.g.*, Opp. at 1. She contended that the facts pleaded in the complaint constitute the kind of sexual harassment captured by the act,

11

focusing on the allegations in the complaint that she was "subjected to gender-based stereotyping . . . , denied workplace accommodations routinely granted to male employees . . . , excluded from substantive work assignments given to lower-ranked male colleagues, and subjected to heightened surveillance and micromanagement not applied to men." *Id.*

In her opposition, Ms. Waiguchu conceded that she does not allege that she was subject to "lewd or sexual content." *Id.* at 11. However, she contended that she was subjected to a hostile work environment because of her gender. *Id.* at 11–13. The complaint sufficiently alleged this, she argued, because of the differential treatment of male and female employees. *See id.* at 12 ("[t]he differential application of surveillance based on gender created an intimidating, hostile work environment where Plaintiff, as a woman, was treated as untrustworthy and requiring constant oversight, while men were afforded autonomy and respect"); *id.* at 12 ("[t]his pattern of exclusion based on gender, giving men opportunities while denying them to women, constitutes gender-based harassment"). Ms. Waiguchu also argued that the conduct pleaded constituted sexual harassment conduct under the EFAA because "Mr. Krause repeatedly shouted at Plaintiff, berated her in meetings, spoke to her in a 'condescending and hostile tone,' and made belittling comments to her." *Id.* at 12. The motion was fully briefed on December 19, 2025, when Morgan Stanley filed its reply. Dkt. No. 24 ("Reply").

### III.    LEGAL STANDARD

#### A.  The Federal Arbitration Act

Section 4 of the Federal Arbitration Act (the "FAA") provides that parties can petition the district court for an order compelling arbitration. *See* 9 U.S.C. § 4. Section 4 of the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.  A party has "refused to arbitrate" within the meaning of Section 4 if it "commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation and brackets omitted); *see also Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) (finding no refusal to arbitrate where respondents had neither commenced litigation nor failed to comply with an order to arbitrate).

In order to determine whether an action should be sent to arbitration, courts in this Circuit engage in the following inquiry:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).  "In deciding a motion to compel arbitration, 'the role of courts is limited to determining two issues:  i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'"  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (quoting *LAIF X SPRL*, 390 F.3d at 198).

"It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate."  *Isaacs v. OCE Business Services, Inc.*, 968 F.Supp.2d 564, 567 (S.D.N.Y. 2013) (citations omitted).  "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*,

13

537 U.S. 79, 83 (2002)).  "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties."  *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, with respect to an arbitration agreement, "as with any other contract, the parties' intentions control" (quotation omitted)).  Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  *Nicosia*, 834 F.3d at 229 (citation omitted).

However, "[t]he Supreme Court has interpreted the FAA broadly, finding a 'liberal federal policy favoring arbitration agreements.'"  *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533 (E.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (brackets omitted).  Furthermore, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation omitted)).  If the Court determines "that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

### B.  The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA") amended the FAA by carving out an exception to section 4.  The EFAA provides:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).  A "sexual harassment dispute" is "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 401(4).

Neither party argues that the complaint alleges conduct constituting "sexual harassment" under applicable federal law.  Under Title VII, a claim of "sexual harassment in the work place can proceed under two theories:  quid pro quo harassment and a hostile work environment."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998); *see also Petrosino v. Bell A.*, 385 F.3d 210, 225–26 (2d Cir. 2004).  Here, there are no allegations of quid pro quo harassment, and Plaintiff does not contend that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that [was] 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

As a result, the Court's focus is whether the complaint alleges conduct constituting a "sexual harassment dispute" under applicable state law.[2]  The NYCHRL "provides the most lenient applicable liability standard" of the statutes upon which Ms. Waiguchu relies.  *Singh v. Meetup LLC*,

---

[2] The Court agrees with the analysis in *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 552 n.14 (S.D.N.Y. 2023), and *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 182 n.2 (S.D.N.Y. 2023), that the term 'State law' in 9 U.S.C. § 401(4) encompasses the law of states' subdivisions and therefore includes the NYCHRL.  *See Singh*, 750 F. Supp. 3d at 255.  Morgan Stanley has not argued that the NYCHRL does not constitute "State law" for purposes of the EFAA.  *See generally* MOL, Reply.

750 F. Supp. 3d 250, 255 (S.D.N.Y. 2024), *reconsideration denied*, No. 23-cv-9502, 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024) (internal quotation marks omitted).  Last year, this Court was required to define the meaning of conduct constituting sexual harassment for purposes of the EFAA when a plaintiff asserted a claim under the NYCHRL.  The Court defined it as "'unwelcome verbal or physical behavior based on a person's gender,' regardless of whether that behavior is lewd or sexual in nature." *Owens*, 786 F. Supp. 3d at 845.  The Court "decline[d] to adopt a requirement that the unwelcome verbal or physical behavior be lewd or sexual in nature." *Id.* at 846.  At the same time, the Court emphasized that the standard was "a higher bar than simply alleging that a plaintiff was treated less well than other employees because of gender." *Id.* at 847 (cleaned up).

Courts in the Southern District have almost uniformly employed a "plausibility standard" in determining whether a plaintiff has "alleged" conduct constituting sexual harassment.  *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585–88 (S.D.N.Y. 2023); *Toomey v. One Equity Partners*, No. 24-CV-04088, 2026 WL 458244, at *4 (S.D.N.Y. Feb. 18, 2026); *Smith v. Meta Platforms, Inc.*, No. 24 CIV. 4633, 2025 WL 2782484, at *9–11 (S.D.N.Y. Sept. 30, 2025); *Brazzano v. Thompson Hine LLP*, No. 24-cv-01420, 2025 WL 963114, at *6 (S.D.N.Y. Mar. 31, 2025); *Singh*, 750 F. Supp. at 253.  Judge Liman, in a case now up on appeal before the Second Circuit, disagreed, reasoning that "the EFAA speaks to 'allegations,' *i.e.* the content of a pleading, and not to the conclusion that those allegations plausibly state a claim for relief if the pleading is challenged under Rule 12(b)(6)." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 535 (S.D.N.Y. 2024).  Because both parties agree that the plausibility standard applies here, the Court will apply the plausibility standard to determine whether Ms. Waiguchu has alleged conduct constituting sexual harassment.  *See* MOL at 1 ("Plaintiff must state a plausible claim of sexual harassment to fall within the protections of the [EFAA]."); Opp. at 7 ("Plaintiff need only plausibly allege that she was subjected to unwelcome verbal or physical behavior based on her gender.").

## IV.    DISCUSSION

### A.  Dismissal of Plaintiff's "Sexual Harassment" Claims Is Inappropriate

Morgan Stanley's request that the Court dismiss Ms. Waiguchu's "sexual harassment" claims under Title VII, Section 1981, the NYSHRL and the NYCHRL, and that the Court send the remaining aspects of her claims to arbitration is inappropriate—both procedurally and substantively. "Since jurisdiction generally must precede merits in dispositional order, a district court should generally rule on a motion to compel arbitration before proceeding to a merits-based motion to dismiss." *Stafa v. Innovative Facility Services*, No. 23-cv-10509, 2025 WL 27689, at *5 (S.D.N.Y. Jan. 3, 2025) (quoting *Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 181 (S.D.N.Y. 2018)); *see also United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allide Indus. and Serv. Workers Loc. 4-5025 v. E.I. DuPont de Nemours & Co.*, 565 F.3d 99, 102 (2d Cir. 2009) ("And in reviewing whether claims are arbitrable, a court is not to rule on the potential merits of the underlying claims even if the union's grievance appears to the court to be frivolous." (cleaned up)).  "[B]ecause a motion to compel arbitration goes to the Court's power to hear a case, such a motion is analogous to—and sometimes treated as—a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)." *Harris*, 338 F. Supp. 3d at 181.  And "[e]ven if the arbitration issue is not considered jurisdictional, it should ordinarily be addressed first as a matter of judicial efficiency." *Id.* at 182.

Thus, Morgan Stanley's request that the Court resolve some of Ms. Waiguchu's claims and then send the remainder to arbitration is procedurally improper.  The Court should not peel some claims off for dismissal before sending the case to arbitration.  Morgan Stanley's request that the Court do so runs contrary to their position that the Arbitration Agreement requires the arbitration of all of Ms. Waiguchu's claims:  if Morgan Stanley wants the Court to resolve Ms. Waiguchu's claims, it can achieve that goal by not asking the Court to enforce the arbitration agreement—it

17

cannot pick and choose.[3]

Morgan Stanley's request that the Court dismiss Ms. Waiguchu's "sexual harassment" claims is also based on a misapprehension of the substantive legal standard: Morgan Stanley conflates the EFAA's standard for determining whether a complaint alleges conduct constituting "sexual harassment" with the pleading standard for Ms. Waiguchu's underlying causes of action. The problem with Morgan Stanley's request is best illustrated in relation to Ms. Waiguchu's claims under the NYCHRL. To adequately plead a cause of action for discrimination under that statute, Ms. Waiguchu must plead that, among other things, she was treated "less well" than others on the basis of a protected characteristic, such as her race or gender. The standard applied by the Court to determine whether conduct alleged in a complaint constitutes sexual harassment is a different, higher standard, however, as described above. The Court cannot dismiss her NYCHRL claims applying that higher standard. Morgan Stanley provides no explanation for its apparent belief that the EFAA provides an opportunity for it to seek dismissal of a plaintiff's claims on the basis of a different pleading standard than that established by the statutes governing the plaintiff's claims. To the extent that Morgan Stanley believes that the effect of compelling that a discrimination claim be arbitrated means that the claim itself is limited or dismissed in part, that belief is wholly unfounded. All of Ms. Waiguchu's claims will be heard by the arbitrator; the Court's decision to compel their arbitration does not limit their scope in any way.[4]

---

[3] Were the Court to grant Morgan Stanley's request to dismiss certain claims prior to the arbitration, that decision would presumably be subject to appeal following resolution of the arbitration, for the arbitration would not have resolved those aspects of the plaintiff's claims. Morgan Stanley does not explain why it seeks that outcome rather than an arbitral award that resolves all issues in the case.

[4] Indeed, the arbitrator could conclude, based on the facts presented to her, that Ms. Waiguchu's experiences did constitute sexual harassment and impose an award on the basis of that finding. The Court's determination that Ms. Waiguchu's claims are not subject to the EFAA as pleaded does not preclude such a conclusion by the arbitrator, who will make her decision on the basis of a complete evidentiary record.

**B. Ms. Waiguchu Does Not Plausibly Plead Conduct Constituting Sexual Harassment Under the NYCHRL**

Ms. Waiguchu does not plausibly plead allegations of conduct constituting sexual harassment. The allegations in her Complaint do not rise to the level of "unwelcome verbal or physical behavior based on a person's gender" required for her case to fall within the scope of the EFAA. *Owens*, 786 F. Supp. 3d at 847. Ms. Waiguchu alleges, at most, that she was "treated less well than other employees because of [ ] gender," which does not rise to the level of conduct constituting sexual harassment. *Id.* at 847 (quoting *Delo*, 685 F. Supp. 3d at 182). As a result, her claims do not fall within the Arbitration Agreement's provision that excludes claims captured by the EFAA.

Fundamentally, Ms. Waiguchu's arguments are based on an incorrect interpretation of the standard articulated by the Court in *Owens*. Ms. Waiguchu describes the standard adopted by the Court in *Owens* as follows:

> This expansive definition encompasses gender-based discrimination, including gender stereotyping and application of gender-based stereotypes in performance evaluations and workplace treatment, differential treatment based on gender in the terms and conditions of employment, denial of workplace accommodations or flexibility based on gender, hostile work environment created through gender-based harassment, even absent sexual content, and discrimination based on caregiver status and family responsibilities, which disproportionately affects women.

Opp. at 8. Ms. Waiguchu believes that the Court has endorsed a view of the type of conduct that constitutes sexual harassment for purposes of the EFAA that is substantively equivalent to the NYCHRL's pleading standard, which requires merely that a plaintiff be treated "less well" on the basis of her gender. As a result, Ms. Waiguchu argues that differential treatment on the basis of one's gender alone constitutes "sexual harassment."

This is a misreading of the Court's decision in *Owens*. As described above, in *Owens*, the Court held that the test under the EFAA "is a higher bar than simply alleging that a plaintiff was

19

'treated less well than other employees because of [ ] gender.'" *Owens*, 786 F. Supp. 3d at 847 (quoting *Delo*, 685 F. Supp. 3d at 182). While in *Owens*, the Court "decline[d] to adopt a requirement that the unwelcome verbal or physical behavior be lewd or sexual in nature," the Court held that differential treatment motivated by a plaintiff's gender was not by itself "sexual harassment" for purposes of the EFAA. *Id.* at 846. The Court must examine the nature of the conduct alleged to determine whether it meets that test. Here, it does not.[5]

Ms. Waiguchu's allegations that she was subjected to differential treatment and "microaggressions" based on her gender do not constitute sexual harassment conduct under the EFAA. Alleged differential treatment on the basis of her gender and race is the consistent theme of Ms. Waiguchu's complaint. For example, Ms. Waiguchu alleges that her managers at Morgan Stanley were "belittling and condescending." Compl. ¶ 31. Mr. Krause called her "defensive and judgmental" and "berated" her during a meeting. *Id.* ¶¶ 19, 26–27. He made jokes about her intelligence and subjected her to microaggressions. *Id.* ¶¶ 29, 34, 39, 41. Ms. Waiguchu alleges that Mr. Krause's treatment of her and her single Black female colleague differed from that of her white, male colleagues. *Id.* ¶ 46 ("Ms. Waiguchu experienced an escalating pattern of targeted monitoring and micromanagement that differed from her white and male colleagues.").

Ms. Waiguchu also alleges that her other managers targeted, micromanaged, and demeaned her. *Id.* ¶¶ 59, 62 (describing Mr. Stetter as "less friendly" and "less communicative with [Ms. Waiguchu] compared to her white and male colleagues"); *id.* ¶ 71 ("Ms. Chotani routinely approved

---

[5] Plaintiff's misunderstanding of the Court's holding in *Owens* may be attributable in part to imprecise language in the opinion. In particular, in *Owens*, the Court wrote that "if a plaintiff alleges that they were *harassed by being shouted at* or shoved and that the harassment or assault was motivated by their gender, the Court's analysis need not turn on whether the words shouted or the contact made was sexual in nature." *Owens*, 786 F. Supp. 3d at 846 (emphasis added). The Court did not mean to imply that any shouting motivated by gender would meet the standard under the EFAA—the Court required that the alleged shouting constitute "sexual harassment." That is why the Court wrote "harassed *by* being shouted at"—to require that the underlying conduct of which shouting was a part constituted sexual harassment, as opposed to, as the Court finds here, rude, disparate workplace treatment that did not rise to the level of sexual harassment. *Id.*

remote work and early departures for white and male employees . . . while denying similar flexibility to Ms. Waiguchu.").

These allegations of differential treatment do not constitute "sexual harassment" conduct for purposes of the EFAA. While this conduct was unwelcome to Ms. Waiguchu, and may form the basis for a claim of discrimination as differential treatment on the basis of Ms. Waiguchu's gender, the drafters of the EFAA did not extend its protection to all categories of gender-based discrimination, as described by the Court in *Owens*. The allegations of differential treatment and microaggressions in the complaint are not conduct constituting "sexual harassment" under the EFAA.

The two instances in which Ms. Waiguchu alleges she was shouted at do not plead conduct that constitutes "sexual harassment" for purposes of the EFAA. Ms. Waiguchu pleads two instances during the course of her employment at Morgan Stanley in which her supervisor shouted at her. First, where Mr. Krause "berated" her during a meeting, "repeatedly shouting at her to 'listen'" and lecturing her; and second, where Mr. Krause "shouted at her in front of multiple colleagues, once again targeting her for her supposed 'negative personality trait' of defensiveness." Compl. ¶¶ 27, 39. The Court believes that hostile abusive conduct, such as shouting, can constitute "sexual harassment." *See Owens*, 786 F. Supp. 3d 831. However, Ms. Waiguchu's complaint does not adequately plead it in this case. Mr. Krause did not use gendered terms. *Cf. Toomey*, 2026 WL 458244, at *6 (finding plaintiff sufficiently alleged sexual harassment where she was "berated . . . in gendered terms" by being called a "bitch," a word that "often reflects an intensely degrading hostility towards women"). In both instances, Mr. Krause allegedly berated Ms. Waiguchu in a group setting regarding her work performance. While Mr. Krause's disproportionately hostile and rude feedback regarding Ms. Waiguchu's work may have been motivated by Ms. Waiguchu's gender, as she alleges, his conduct did not rise to the level of "sexual harassment" targeted by the EFAA.

21

For the foregoing reasons, Ms. Waiguchu does not plausibly plead conduct constituting sexual harassment for purposes of the EFAA. Thus, her claims are not excluded from the scope of the Arbitration Agreement.

### C. Enforcement of the Arbitration Agreement

Ms. Waiguchu does not challenge the validity or enforceability of the Arbitration Agreement she signed upon accepting Morgan Stanley's offer of employment. *See* Opp. at 1; Stips. at 1; Dkt. No. 16. Because none of Ms. Waiguchu's claims fall under the EFAA's protections, her claims are subject to mandatory arbitration pursuant to the terms of the Arbitration Agreement.[6]

Morgan Stanley requests that the Court stay this proceeding pending resolution of any arbitration. MOL at 1, 14. The FAA directs a district court to enter a stay of proceedings in cases where the claims are "referable to arbitration." 9 U.S.C. § 3. A court may not dismiss a case, and instead must issue a stay, "when the dispute is subject to arbitration and a party requests a stay pending arbitration." *Spizzirri*, 601 U.S. at 474; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). Moreover, "a mandatory stay is consistent with the FAA's underlying policy 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.'" *Katz*, 794 F.3d at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)); *see also Hamzaraj v. ABM Janitorial Ne. Inc.*, No. 15-CV-2030, 2016 WL 3571387, at *5 (S.D.N.Y. June 27, 2016) (collecting cases). Therefore, the Court stays this case pending arbitration of Ms. Waiguchu's claims.

---

[6] Any further question of arbitrability is governed by the Arbitration Agreement which, in this case, delegates the question of arbitrability to the arbitrator. Stips. at 10 ("Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement . . . must be resolved by the arbitrator, not the court.").

## V.    CONCLUSION

For the foregoing reasons, Morgan Stanley's motion to compel arbitration of the claims in this action is GRANTED and the case is stayed.  Morgan Stanley's motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 21.

SO ORDERED.

Dated:  April 1, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge

23